# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                              PLAINTIFF

v.                                                                   No. 3:23-cr-100-BJB

QUINNTON DAWSON                                                      DEFENDANT

**\* \* \* \* \***

## OPINION & ORDER DENYING DEFENDANT'S MOTION
### FOR JUDGMENT OF ACQUITTAL AND NEW TRIAL

A jury convicted Quinnton Dawson of nine counts of producing, distributing, receiving, and possessing child pornography. Over the course of a three-day trial, the Government presented overwhelming evidence that Dawson sexually abused his girlfriend's four-year-old daughter, "Ella" (a pseudonym).

Now Dawson seeks to set aside that jury verdict, demanding acquittal or a new trial based on perceived deficiencies in the Government's proof and alleged errors in the Court's evidentiary rulings. But his arguments do not overcome the high bar that protects a jury's verdict from judicial reversal. So the Court denies his motion.

## I. Investigation

This case concerns two main groups of images: one set of videos of Ella, recorded by and often showing Dawson, and another set of videos and still images, not portraying him or Ella, which he received and distributed. The Ella images correspond to Counts 1–3, while the other images correspond to Counts 4–8. All the images, which a jury bravely viewed during trial, are—to say the least—offensive and disturbing.

### A. Receipt and distribution charges

Three exchanges constituted the bulk of the Government's proof with respect to these charges.

The FBI's Louisville Child Exploitation Task Force, in September 2022, received a cyber-tip from the National Center for Missing and Exploited Children. The tip concerned the activity of "jakswag14@yahoo.com." NCMEC had detected this account sending and receiving images of child sexual abuse material. *See generally*

1

Trial Testimony, Day 1 (Payne).[1]  This account discussed and exchanged illicit material with at least three other email accounts.

1. *"Ed Art."*  On July 12, 2022, the jakswag14 account sent an email to an account labeled "Ed Art."  The title was "Trade."  Government Exhibit 12A.  The next day, Jakswag14 then received five videos of adult males having sex with minor females.  Jakswag14 responded, "Omg u have GREAT ONES!  I only have pics sorry lol but I hope u have more!"  Government Exhibit 12B.  Jakswag14 returned five images to Ed Art: an adult male penetrating a male child's mouth, a female child wearing a fishnet bodysuit, and three images of female children wearing thongs.  Trial Testimony, Day 2 (Kiger).  Jakswag14 then expressed his desire for more: "And do you know anyone else with more vids or pics like yours?  Im so turned on now lol."  Government Exhibit 12D.  Ed Art responded that he was "46 years old," "trying to get more [images or videos]," and "love[d] to masturbate with small dreams."  Government Exhibit 12E.  Jakswag14 replied, "pleeease get more," "[m]e too," and "I am 41."  Government Exhibit 12F.

2. *"Evli."*  Two days later, jakswag14 proposed an exchange with a different email account dubbed "evli."  "You send first and I will return.  I have good ones."  Government Exhibit 14B.  Evli obliged with video files titled "pthc" ("preteen hard core," a Government expert explained) and "vicky" (an identified victim of child pornography, the Government expert explained).  *See* Government Exhibit 14C.  In that video, a naked adult male digitally penetrated a female's anus, while another hand (apparently female) penetrated her vagina.  Trial Testimony, Day 2 (Kiger).  Jakswag14 responded: "Do you have more?"  Government Exhibit 14D.  Evli sent another clip—with a file extension including the terms "pthc" and "fuck and suck"—and instructed jakswag14 to download a file-sharing application in order to view it.  *See* Government Exhibit 14E–G.  But jakswag14, apparently struggling to download the application, responded that "I can not find it.  Maybe we do not have it in the U.S."  Government Exhibit 14H.  Jakswag14 promised, too, that "I will take good pictures."  Government Exhibit 14I.  After receiving the video in another format, jakswag14 wrote: "I got the video that time.  Yes I love the oral videos! please more of those."  Government Exhibit 14L.  Later he repeated that request: "Please more oral."  Government Exhibit 14O.  And he sent a 23-second video of an adult male on

---

[1] Because no party has ordered an official trial transcript or cited specific page and line numbers in their post-trial briefs, this opinion refers generally to the witnesses' trial testimony.  Some errors of typography and precision are therefore inevitable.  The opinion refers to witness testimony in part to aid the parties and reviewing court in the event of an appeal.  But the decision denying Dawson's motions rests principally on the presiding judge's observations of the trial and proof—and not on a rough draft of the trial transcript.

top of a naked female child. *See* Government Exhibit 12A4. The requests continued: Evli asked, "do you have a fuck video??" "Yes if you send more sucking video," jakswag14 promised, "I will send fuck video." Government Exhibit 14Q.

**3. *"Alberto Suares."*** Between July 12 and 15, jakswag14 asked to "trade" with an account named Alberto Suares. Government Exhibit 17A. Dawson sent Suares an image that he had received in a July 12 email exchange with Ed Art: a female with two men on top of and beside her, one with his penis in her mouth. Government Exhibit 17B; Trial Testimony, Day 2 (Kiger). "Ok I sent," jakswag14 wrote. Government Exhibit 17C. Then jakswag14 expressed his preferences: "I like oral videos or pics." Government Exhibit 17D. Still waiting on the "trade," jakswag14 wrote: "I sent you 1. Can you send me 1? Oral." Government Exhibit at 17F. Suares, admitting he had nothing of "that caliber," sent Dawson a 45-second video of two individuals (seemingly of minor age), in school uniforms, having sex on a desk. *See* Government Exhibit 17H; *see generally* Trial Testimony, Day 2 (Kiger).

**4. *Other.*** Jakswag14 continued to trade emails and images with other email accounts in exchanges not charged in the indictment but nevertheless admitted as relevant at trial. He sent a "Susi" account an image he received from Ed Art on July 12: the image showed a female child, with her back arched, and a man ejaculating in front of her. *See* Government Exhibit 15A–B. To a "Darius Knox," Dawson requested another "trade." "I have good videos," he wrote; "[d]o you have any oral videos or oral pics?" Government Exhibit 16.

**\* \* \***

Law enforcement obtained and executed a warrant to search jakswag14 and its related account, jakswag22.[2] The search yielded a resume, social security card, and letter from the Social Security Administration—each labeled with or addressed to "Quinnton Dawson." *See* Government Exhibits 9–11.

A man named Quinnton Dawson, it turns out, had pleaded guilty in Jefferson (Ky.) Circuit Court just months earlier, in November 2021, to 25 counts of possessing and distributing sexually explicit images of a minor. *See* Government Exhibit 54. He received a sentence of five years in prison, but the parole board released him on shock

---

[2] Shortly after sending the emails to Evli, Ed Art, and Suares, the jakswag14 email account was suspended, apparently causing the user to lose access to the account. *See* Trial Testimony, Day 3 (Kiger). A week later, the jakswag22 account was activated. *See* Trial Testimony, Day 2 (Payne). Law enforcement obtained a warrant to search both accounts. But the evidence at trial focused almost entirely on the activity of the jakswag14 account, used to send and receive the sexually explicit material discussed above.

probation after five months.  Dawson remained subject to special conditions of probation, however.  He had to register as a sex offender, consent to unannounced searches, access the internet only while monitored, and disclose to his probation officer his cell phones, electronic devices, and any related equipment.

His state probation officer was Natalie Popham, who testified (on day one) that she met with Dawson to monitor compliance with his conditions of release.  In September 2022, Dawson told Popham that he was using his mother's phone because he lacked his own.  Dawson attended his meeting with Popham in July but missed the following appointment.  *See* Trial Testimony, Day 1 (Popham).

Popham soon learned from Lorin Payne, a Task Force Officer working with the FBI, that federal authorities had opened an investigation into Dawson in response to the NCMEC report.  Popham then texted Dawson at the number he had described as his mother's, instructing him to report to Popham's office.  Dawson returned Popham's call from a different phone number.  When he arrived at the meeting on September 29, he told Popham that he owned a new flip phone.  But Popham suspected (based on her conversations with Task Force Officer Payne and Dawson's call from a new number earlier that day) that Dawson had concealed another device.  So she checked security footage and noticed Dawson detour to the side of the office before entering the building.  When she retraced Dawson's route, patrons of a nearby bingo hall alerted Popham that Dawson had dropped something in a nearby trashcan.  That's where Popham discovered a blue Samsung phone.  *See* Government Exhibit 51.  Dawson denied ownership, but when Popham called the number from which she received his call earlier that day, the phone rang.  Undeterred, Dawson again denied ownership.  So Popham mentioned she would alert Task Force Officer Payne about the phone; that apparently caused Dawson to grab the phone and try to manipulate the screen.  He refused to return the phone to Popham until her supervisor entered the room.  Once he did, Popham turned over the device to Officer Payne.  *See* Trial Testimony, Day 1 (Popham).

To connect the phone and email account, the FBI confirmed that the number for the Samsung phone seized from Dawson was the same number listed as the account-recovery phone number for the jakswag Yahoo accounts.  *See* Trial Testimony, Day 1 (Payne).  The phone also contained images sent and received using the jakswag Yahoo email account—specifically, the July 13 and 15 email exchanges between jakswag14 and Ed Art, Evli, and Suares.  *See* Trial Testimony, Day 3 (Kiger).

### B.   Sexual-exploitation charges

The phone also contained other images that proved even more troubling.  They showed Dawson himself in videos and photos with a very young girl.

4

In one group of images, Dawson's penis penetrates the mouth of the girl, who was blindfolded. *See* Government Exhibits 24A-1–40. In another, the same little girl lays on a couch in a t-shirt and underwear, while a man later identified as Dawson rubbed his bare penis against her legs until he ejaculated. *See* Government Exhibit 27D-2. Another set of images shows the girl asleep on a bed, in shorts and t-shirt, while Dawson lays his bare penis on her backside. *See* Government Exhibit 28C–E.

Some of the images found on the phone had been manipulated to simulate motion, rendering them even more suggestive and graphic. An application called "Jellify," a witness later explained, allowed a user to add animation to portions of still images. *See* Trial Testimony, Day 2 (Kiger). One used still photos of Dawson's penis alongside the child's buttocks to simulate the penis moving up and down. Another file showed that same child in fishnet stockings in a bathroom. The phone's camera roll included images of the child in black and red high heels, laying on her side with her buttocks showing and Dawson kneeling beside her. *See generally* Government Exhibits 21–28; Trial Testimony, Day 2 (Kiger).

Other videos displayed Dawson setting up a recording device and then using it to record himself simulating sex (or engaging in "sexually suggestive" conduct, as testimony put it) with the child. Another animated Jellify image showed Dawson's penis moving in and out of the girl's mouth. Finally, other images portrayed the four-year-old in a collage along with photos of another blindfolded minor girl sitting a bathing suit and of other adult females engaging in oral sex. *See* Government Exhibits 26A–E.

After seizing the Samsung phone, law enforcement conducted a "Cellebrite report," using forensic software by that name to extract the phone's digital contents. The report revealed that the user of the Samsung searched "blindfold deepthroat" 62 times in August 2022. Government Exhibit 33A. That report also showed that the Samsung phone accessed Yahoo during the same July 13–15 window when the jakswag accounts had the email exchanges described above. *See* Government Exhibits 47 & 48. And at some point (the precise date wasn't clear), the Samsung phone downloaded photo-editing applications, such as a GIF and collage maker. Government Exhibits 31A & 31B. *See generally* Trial Testimony, Day 2 (Kiger).

The final pieces of this sad puzzle came together when law enforcement identified text messages between Dawson (using the Samsung phone) and a woman named Kendra. These suggested the two began some sort of relationship in July or August 2022—several months after Dawson's release on shock probation. *See* Trial Testimony, Day 3 (Kendra). Once law enforcement found Kendra, they learned she had a four-year-old daughter—the same girl seen in the images with Dawson from the Samsung phone.

Kendra testified at trial that she was a struggling young mother from Cincinnati. Her father had kicked her and Ella out of his house. *See generally* Kendra's Testimony, Trial Day 3. So she'd moved to Louisville and searched for friends (not dates, she emphasized) on an application called "plenty of fish." Dawson responded, befriended Kendra, and moved in with her and Ella in August 2022. First they stayed in an apartment on Hardy Avenue and then in another on Starlet Avenue, both in the Louisville/Jefferson County metro area. Law enforcement visited both locations and found walls, flooring, layouts, and furnishing that matched that visible in the images of Dawson and the four-year-old on the Samsung. *See generally* Trial Testimony, Day 2 (Payne).

## II. Indictment

A grand jury indicted Dawson on three counts of sexual exploitation of a child; one count of receipt, distribution, and possession of child pornography; and one count of committing these offenses as someone required to register as a sex offender. Indictment (DN 3). A superseding indictment added two more charges—one for distribution and another for receipt. Superseding Indictment (DN 15). As the Government later explained the relationships between charges and images:

- Count 1: Dawson penetrating Ella's mouth while she was blindfolded.
- Count 2: Dawson humping Ella's backside with his bare penis while she lay on a couch.
- Count 3: Dawson rubbing his penis against Ella's backside while she slept on a bed.
- Counts 4 and 5: Dawson receiving and distributing child pornography through the jakswag Yahoo account to Ed Art "on or about July 13, 2022."
- Counts 6 and 7: Dawson receiving and distributing child pornography through the jakswag Yahoo account to Evli and Suares "on or about July 15, 2022."

*See generally* Superseding Indictment at 1–5; Gov't Pretrial Memorandum (DN 64).

## III. Pretrial Motions

Given the sensitive and disturbing nature of the evidence, both parties filed a slew of pretrial motions and notices. These are largely described in various pretrial motions, orders, and bench rulings. Without recapitulating or superseding those discussions, this opinion briefly describes them to the extent they're relevant to Dawson's post-trial motion.

**A. Severance.** Dawson first sought to sever the sexual-exploitation charges (Counts 1–3) from the remaining receipt and distribution charges. Motion for Separate Trial (DN 16). As explained on the record during a hearing, the Court denied the motion to sever but bifurcated the sex-offender count so the jury didn't initially hear that Dawson was required to register as a sex offender. *See generally* Memorandum of Conference and Order (DN 23); Memorandum of Conference and Order (DN 26).

**B. Bench trial.** Dawson sought to "waive" his right to a jury trial. Motion to Waive Jury Trial (DN 34). But the Government insisted on a jury trial, and the Court held, in a written opinion, that under these circumstances Dawson couldn't force a bench trial over the prosecution's objection. Opinion and Order (DN 54).

**C. Other Acts & Unfair Prejudice.** Dawson's post-trial motion purports to "incorporate" the arguments asserted in the pretrial motions docketed at DNs 67, 68, and 81. *See* Motion at 3–4. Dawson objected to the Government's notices, DNs 43 and 52, that it intended to offer evidence of other uncharged acts. The Court discussed these at length during the final pretrial conference and first day of trial before the jury panel arrived. *See* Memorandum of Conference and Order (DN 72); Trial Day 1.

First, Dawson opposed the Government's introduction of his state conviction for possessing images of sexual performance by a minor. Government's Notice (DN 43); Defendant's Response (DN 69). Any mention of his "shock" probation and conditions of release, Dawson insisted, were highly prejudicial. As discussed on the record and more fully below, the Court largely agreed: given the nature of this evidence, the Government could not mention "shock" probation or introduce Dawson's state conviction or related probation conditions during the first phase of the bifurcated trial. With one exception: To make sense of the beginning of the investigation, much of which occurred at or outside a state probation office, the Government could elicit limited testimony from Officer Popham about Dawson's appearance at the office and her seizure of his phone.

Second, Dawson opposed the Government's use of uncharged "other acts" evidence: email communications from the jakswag accounts, Dawson's internet and search histories, images of Ella in the bathroom, videos of simulated sex between Dawson and Ella, and encryption applications on the Samsung. Notice (DN 52); Defendant's Response (DN 68) at 4–7. The Court largely disagreed: limited presentation of uncharged emails wasn't unduly prejudicial, and the emails were part and parcel of the charged course of conduct. These were sexually charged emails and internet queries sent and received from devices or accounts associated with Dawson during the same period as the charged conduct. None of the search histories or

7

uncharged images, moreover, were any more inflammatory or disturbing than the charged conduct. Regardless, to minimize unnecessary prejudice or distraction, the Government pledged to present this evidence only briefly. With those caveats and reassurances, the Court rejected the motion to exclude this evidence.

**D. Timely Disclosure.** Dawson argued that the Government failed to properly disclose his emails with "Suares." He contended that because the FBI's FD-302s (*i.e.*, investigative reports) did not mention "Suares," the Government failed to notify him that those emails were charged as Counts 6–7, alongside the Evli exchanges. *See generally* Bench Conference, Trial Day 1. The Court overruled the objection after the Government explained that Dawson's counsel had access to and reviewed those emails at the Government's office, and its pretrial filings made clear that it had charged him with sending emails to two individuals on July 15. *See* Government's Pretrial Memorandum (DN 64) at 5–7 ("On July 15, 2022, Dawson distributed one of the videos he received from Individual 1 to *another* individual." (emphasis added)).

Dawson also moved to exclude, as untimely produced, evidence and testimony regarding animated images and the applications used to generate such images. Defendant's Motion (DN 77) at 5–11. The Government had represented for months that only still images supported its charges for Count 1. But then, two weeks before trial, the Government supplemented that disclosure to include an animated GIF file. This occurred after the Court's deadline for disclosure, *see* DNs 33 & 60, limited defense counsel's ability to respond, and unfairly prejudiced Dawson's defense. The Court largely agreed with the defense regarding the GIF, Jellify, and collage files, each of which it excluded. So the Government had to rely on unmanipulated still images to prove Count 1. But the Court *did* admit evidence regarding the existence of Jellify, GIF, and collage-maker applications on the Samsung. Not only was that evidence less sensational and prejudicial, but the Government had already disclosed it in the Cellebrite report several months before. *See* Bench Conference, Trial Day 1.

**E. Expert Disclosure.** Dawson then contended that the report of Agent Kiger, identified by the Government as an expert, included "no opinion" that the Jellify and collage-maker applications previously installed on the Samsung had modified any of the images that the Government intended to introduce. Motion to Limit Testimony (DN 79) at 4. Nor did the expert, Dawson argued, opine that the Samsung captured the uncharged images that featured Ella or explain "how" the images underlying Counts 1–3 "got onto the phone." *Id.* at 7. So Dawson sought to exclude these opinions from his testimony.

The Government responded, however, that because "[n]one of these are opinions held by Forensic Examiner Kiger," the Government wouldn't "seek to elicit

them from him at trial." Response (DN 82) at 4. But to alleviate defense counsel's concerns, the Court directed the Government to *voir dire* its expert witness about each of these topics before his testimony. In response to that questioning, the expert never opined that the Samsung *created* the images, or that applications on that phone definitively modified the images. With those assurances of limited (and noncommittal) testimony regarding the files' origins, the Court denied Dawson's request as moot.

## IV. Trial

The Government presented evidence over the course of three days. The jury saw the images, emails, and text messages to the extent ruled admissible and heard four witnesses describe these events: Probation Officer Natalie Popham, Task Force Officer Lorin Payne, Special Agent Kiger, and Kendra—Ella's mother.

At the close of the Government's case-in-chief, defense counsel moved for a judgment of acquittal, arguing that the Government failed to meet its evidentiary burden on the first eight counts at issue in phase one of the bifurcated trial. The Court reserved ruling on the motion until after the jury verdict. *See* FED. R. CRIM. P. 29(b).

After the Court's admonition about his right to testify, or not—and his right to put on a defense case, or not—Dawson declined to offer any proof.

During closing, defense counsel skillfully challenged the sufficiency of the Government's evidence. She argued that Dawson's own interest in sexual gratification—not any intent to produce pornographic images for others—motivated his actions. *See* Closing Arguments, Trial Day 3. She argued reasonable doubt: Agent Kiger had testified only that the Samsung "possibl[y]" produced the images at issue in Counts 1–3. *Id.* Count 3, moreover, did not amount to sexually explicit conduct, or "lascivious" exhibition, as defined in the jury instructions.

After the jury left to deliberate, the Court denied the motion for acquittal—explaining on the record why a reasonable jury could find Dawson guilty beyond a reasonable doubt of all eight counts. The jury quickly convicted Dawson of all eight counts tried during Phase One.

Then, during a brief Phase Two on the bifurcated ninth count, the Government called Popham back to the stand. Now that his sex-offender status could not prejudice the jury's consideration of Dawson's production, distribution, and receipt charges, the Court allowed necessary testimony about Dawson's previous sex-offense conviction. Then the jury heard the Court's instruction on Count 9 regarding the possession and distribution of sexually explicit images of minors while required to register as a sex offender. The jury, again, quickly returned a guilty verdict.

9

### V. Motion for Judgment of Acquittal

Dawson argues that the jury had too little evidence to convict him.[3]   His sufficiency-of-the-evidence argument invokes Criminal Rule 29, which authorizes trial judges to displace jury verdicts and enter judgments of acquittal if "the evidence is insufficient to sustain a conviction."   *See* Motion at 1 (seeking a "judg[m]ent of acquittal").

In asking a judge to "set aside" the jury's "verdict," FED. R. CRIM. P. 29(c), Dawson "bears a very heavy burden," *United States v. Henley*, 360 F.3d 509, 513 (6th Cir. 2004).   A jury verdict withstands a Rule 29 motion if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).   In reviewing the evidence, a trial judge does not "weigh the

---

[3] Dawson's 8-page motion purports to "incorporat[e]" by reference his pretrial responses, motions, and on-the-record objections.  Motion at 3–4.  It advances two main arguments: "[t]he evidence … was insufficient to support a conviction of guilty," and "[t]he Court committed prejudicial error" through a variety of perceived erroneous evidentiary rulings and a jury instruction.  *Id.* at 1.  These errors, he suggests, require acquittal (Rule 29) "or, in the alternative," a new trial (Rule 33).  *Id.* at 7.  He fails to distinguish, however, which arguments support which remedy.  Instead, all contentions fall under one vague banner: "Argument."  *See* Motion at 3.  Yet different legal standards apply to his two distinct requests.

Acquittal is appropriate when "the evidence is insufficient to sustain a conviction."  FED. R. CRIM. P. 29(a).  The reviewing court considers "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt—not whether the trial judge himself believes the manifest weight of the evidence supports the verdict." *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018) (quotation marks, citations, and emphasis omitted).  A new trial, on the other hand, is reserved for cases in which "the jury's verdict was against the manifest weight of evidence" or "where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (cleaned up).  The standard of review also differs:  Rule 33 "calls on the trial judge to take on the role of a thirteenth juror, weighing evidence and making credibility determinations firsthand to ensure there is not a miscarriage of justice."  *Mallory*, 902 F.3d at 596 (citing *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007)).

So the Court, on its best reading of Dawson's motion, identifies and addresses which arguments seemingly invoke grounds for acquittal or a new trial (or both).  And to the extent Dawson intended a different taxonomy, that wasn't clear from the papers and wouldn't have made a difference to the Court's denial in any event.

evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury." *United States v. Ferguson*, 23 F.3d 135, 140 (6th Cir. 1994).

### A. Lascivious exhibition

Dawson's first argument focuses on Count 3. The Government "failed to present sufficient evidence" to convict him because "[t]he images underlying this count were images of child erotica, not pornography." Motion at 4.

To convict Dawson of Count 3, the instructions required the Government to prove and the jury to find, beyond a reasonable double, that Dawson employed, used, induced, enticed, or coerced Ella to engage in any "sexually explicit conduct" for the purpose of producing a visual depiction. That visual depiction, moreover, must've been produced using materials that were mailed, shipped, or transported in interstate or foreign commerce. *See* 18 U.S.C. § 2251(a); Phase I Jury Instructions (DN 89) at 5.

Section 2256(2)(A)(v) defines "sexually explicit conduct" to include "lascivious exhibition of the anus, genitals, or pubic area of any person." To determine whether the charged images fell within that statutory definition, the Court instructed the jury to consider a six-factor test for "lasciviousness" that the Sixth Circuit endorsed in *United States v. Brown*, 579 F.3d 672, 680 (6th Cir. 2009) (applying the factors set forth in *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986)); Phase I Jury Instructions at 5–6. Those factors are: (1) "whether the focal point of the visual depiction is on the child's genitalia or pubic area"; (2) "whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity"; (3) "whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child"; (4) "whether the child is fully or partially clothed, or nude"; (5) "whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity"; and (6) "whether the visual depiction is intended or designed to elicit a sexual response in the viewer." Phase I Jury Instructions at 6. This list, as the Instructions explained, "is not exhaustive, and an image need not satisfy any single factor to be deemed lascivious." *Id.* Neither party objected to this instruction.[4]

Dawson contends that the images fell short of this definition of a forbidden "lascivious exhibition." 18 U.S.C. § 2256(2)(A)(v). *See* Reply to Court's Order (DN 107). His "penis was not inserted into Ella's genitalia," Ella "was fully clothed and

---

[4] Nor did either party address the statutory definition or relevant caselaw in discussing this point in their post-trial motion and response. So the Court ordered supplemental briefing. *See* DN 106.

not in inappropriate attire," and "she appeared to be asleep on her stomach." *Id.* at 3.

This argument fails. The defense advanced, and the jury rejected, a very similar argument during closing. Counsel urged the jury to find that the images of Dawson, with his penis exposed, "bouncing" on Ella while she slept and wore shorts, amounted only to child erotica, not pornography. *See generally* Closing Arguments, Trial Day 3 (Dawson). Nothing about the evidence or instruction would lead the Court to disturb the jury's finding to the contrary.

This "sexually explicit conduct included the "exhibition" of "any person['s]" "genitals"—Dawson's nude penis. § 2256(2)(A)(v).[5] And a rational jury could surely consider that exhibition "lascivious." Not only was Dawson exposed and simulating sex, but his four-year-old victim was lying on a bed with her buttocks angled upward and only barely covered by her shorts. Using the *Dost* factors as a guide, a rational jury could have determined, among other things, that the images occurred "in a place … generally associated with sexual activity," featuring a child "in an unnatural pose," and were captured "to elicit a sexual response in the viewer." *Brown*, 579 F.3d at 680. So too could a rational jury consider "lascivious" (or worse) the Jellify version in which Ella's buttocks and Quinnton's penis appeared to move up and down. *See* Government's Reply (DN 109) at 6 ("The act of adding a *wobble* to an image— essentially to create the illusion that his penis was moving up and down on her buttocks—proves that there was no other intent other than to elicit a sexual response."). Dawson offers no reason to disturb the very rational jury finding that Dawson sought to produce an image intended to elicit a sexual response.

### B. Interstate commerce

Dawson next contends that the evidence was "insufficient to establish an interstate commerce nexus for Count[s] 1 through 3." Motion at 6. The statute

---

[5] The first *Dost* factor considers whether the image focuses on the *child's* "genitalia or pubic area," and doesn't mention the corresponding areas of an adult. That is not dispositive; "[t]he *Dost* factors offer a framework to guide analysis, not a checklist or substitute for the statutory text." *United States v. Jakits*, 129 F.4th 314, 323 (6th Cir. 2025). And that text, if anything, seems to sweep broader than *Dost*: "lascivious exhibition of the anus, genitals, or pubic area of *any person*." § 2256(2)(A)(v) (emphasis added). So the jury (and the Court in review of its verdict) was not limited to the *Dost* factors to determine whether a specific image is "lascivious." Their "utility instead lies in their ability to assist courts and juries with engaging in the fact-intensive analysis necessary to separate innocent conduct from those depictions that lie at the 'hard core' of child pornography." *Jakits*, 129 F.4th at 323–24 (quoting *New York v. Ferber*, 458 U.S. 747, 773 (1982)). Given that fact-intensive analysis here, the jury reasonably considered the images lascivious, not innocent.

requires the Government to prove that the "visual depiction was produced using materials that were mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including computer." Phase I Jury Instructions at 5; *see* 18 U.S.C. § 2251. The phrase "in interstate commerce," the Court explained, "means the materials used in connection with the production of child pornography crossed a state line." Phase I Jury Instructions at 6. And "'affecting' interstate or foreign commerce means having at least a minimal effect upon interstate or foreign commerce." *Cf. United States v. Henry*, 429 F.3d 603, 619–20 (6th Cir. 2005) (Commerce Clause authorizes Congress to regulate the possession and use of items, even "instrastate, noneconomic, and without substantial effects on interstate commerce," so long as the item "previously had moved in interstate commerce …. at any time") (quoting *United States v. Chesney*, 96 F.3d 564, 571–72 (6th Cir. 1996)).[6]

The Government sought to prove this element through testimony that Dawson appeared in the images underlying Counts 1–3, which were found on the Samsung. Whether Dawson *took* the images with the Samsung, or instead only copied the images onto the device, makes no difference; either would implicate a foreign-produced device in the offense. The jury saw, and heard testimony about, Dawson setting up a device to record his illicit encounters with Ella. The jury also heard Agent Kiger testify to the existence of photo-editing applications—which could generate Jellify images, GIFs, and collages. And the Government introduced evidence of the images underlying Counts 1–3 that had in fact been edited into Jellify files, GIFs, and collages. So a reasonable jury could have accepted the Government's theory of the case, as advanced in its closing argument: These images didn't just

---

[6] Dawson also objects to the jury instructions' inclusion of "copying" as a means of "producing." Motion at 7. The reason for rejecting Dawson's objection to the instruction appears below. For purposes of the evidence's sufficiency, however, Dawson has apparently foregone any argument that copying the images onto the Samsung would fall short of the interstate-commerce requirement. Had he advanced that position, it would've run headlong into Sixth Circuit precedent: "'producing' child pornography, within the meaning of § 2251(a), encompasses copying images onto a hard drive." *United States v. Lively*, 852 F.3d 549, 559 (6th Cir. 2017). And it has *also* held that copying can satisfy the statute's separate interstate-nexus requirement. *Id.* at 561 ("[T]o violate § 2251(a), a defendant must sexually exploit a minor for the purpose of producing a visual depiction of this exploitation, and *that same visual depiction* must be produced using materials that have an interstate-commerce nexus."). The Samsung phone was manufactured in Vietnam, and it contained images of Dawson sexually abusing Ella. Under controlling precedent, such evidence—showing that Dawson made, created, directed, manufactured, issued, published, advertised, *or copied* images of his abuse on the Samsung—supports a reasonable jury's finding of a foreign-commerce nexus.

"materialize" on the Samsung; Dawson either recorded them on the phone in the first place or else copied them from another device to the phone he was using.

Dawson nevertheless argues that the expert "provided no testimony as to how the images were copied onto the phone," meaning the Government offered "no proof" to support the jury's interstate-commerce findings.  Motion at 6.[7]  But nothing requires expert opinion on this point.  The Government "need not present direct, or 'smoking gun evidence,' of a defendant's guilt."  *United States v. Gardner*, 32 F.4th 504, 523 (6th Cir. 2022) (quoting *United States v. Rosales*, 990 F.3d 989, 996 (6th Cir. 2021)).  "Instead, 'circumstantial evidence alone is sufficient to sustain a conviction, even if it does not remove every reasonable hypothesis except that of guilt.'"  *Id.* (quoting *United States v. Hendricks*, 950 F.3d 348, 352 (6th Cir. 2020)).  And on Rule 29 review, trial judges must "draw all reasonable inferences in favor of the government."  *United States v. Ward*, 957 F.3d 691, 696 (6th Cir. 2020).

True, the evidence doesn't definitively settle whether Dawson used the Samsung phone to record himself and Ella, or "merely" transferred evidence of those encounters to the Samsung.  But evidence certainly indicates that Dawson used the phone in connection with those images—either to copy or record the images.  And the phone indisputably was manufactured in Vietnam.  *See* Trial Testimony, Day 1 (Lorin Payne).  So it necessarily traveled in foreign commerce.

## VI. Motion for a New Trial

Federal Criminal Rule 33 authorizes a trial judge to "vacate any judgment and grant a new trial if the interest of justice so requires."  Although the rule's text leaves

---

[7] Dawson's written motion "incorporates by reference" the (very similar) Rule 29 argumentation his counsel advanced during trial.  Motion at 1.  Counsel had relied heavily on her closing argument to support Dawson's Rule 29 motion.  *See* Closing Arguments, Trial Day 3 (Dawson).  The closing argument ranged broadly but stressed four themes.  First, that Dawson abused Ella for immediate sexual gratification—not for the purpose of creating pornography.  Second, that Kiger testified only about the possibility—not the certainty—that the Samsung created the images of Ella.  Third, that only circumstantial evidence tied Dawson to the images' presence on the Samsung, and thus to copying (including through photo-editing apps).  And fourth, that some of the images charged constituted child erotica rather than child pornography.  Throughout, Dawson's counsel effectively incorporated the fruits of her cross-examination of Kiger—challenging the thoroughness of his report, uncertainties in his testimony, and the integrity of the Government's investigation.  In rejecting Dawson's more focused written motion, the Court acknowledges Dawson's preservation of the issues his counsel ably raised during trial.  But nothing in his written motion, which focuses on a subset of the jury arguments, gives the Court reason to revisit its earlier ruling on the sufficiency of the evidence.  On each point Dawson's counsel pressed during her vigorous closing, a rational jury had ample evidence to convict.

14

"interest of justice" undefined, courts have interpreted it to authorize a new trial if the verdict contradicts the "manifest weight of evidence." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (quotation marks omitted). As noted above at n.3, this standard diverges from that of Rule 29. Rather than demand deference to the jury's verdict, Rule 33 allows the reviewing judge to act as the "thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *Id.* (quotation omitted). Still, a court should order a new trial "[o]nly in extraordinary circumstances, when the verdict exceeds the bounds of reasonableness." *United States v. Burks*, 974 F.3d 622, 625 (6th Cir. 2020) (quotation marks and citation omitted).

## A. Sufficiency of the Evidence

Dawson (seemingly) reiterates his sufficiency-of-the-evidence argumentation under the rubric of Rule 33. *See* Motion at 2, 7. Nothing about the jury's verdict, however, was extraordinary. What was in fact extraordinary was the nature of Dawson's conduct and the quantity and quality of evidence the Government presented against him.

Just as Dawson failed above to show the evidence was insufficient for a rational jury to convict him, he fails to identify anything suggesting the verdict ran against the manifest weight of the evidence or otherwise offended the interest of justice. To the contrary, as already discussed, a mountain of evidence supported his guilt. The Court finds no reason whatever to doubt the credibility or comprehensiveness of the testimony of Probation Officer Popham, Task Force Officer Payne, Special Agent Kiger, or Ella's mother.

Dawson already attempted to cast doubt on the Government's witnesses at trial, criticizing multiple typographical inconsistencies in Kiger's report. *See, e.g.*, Closing Arguments, Trial Day 3. The jury rejected those attempts, and it's not hard to imagine why. These minor errors seem to have little if any effect on Kiger's analysis of the Yahoo accounts and Samsung Cellebrite report. Uncontroverted evidence showed that Dawson controlled the jakswag email account as well as the Samsung; no evidence suggested that anyone else accessed them. Defense counsel was left to highlight the conjectural possibility that someone else *could've* gained access. Having seen the emails and their attachments that captured Dawson's prurient interest in children, and his repeated molestation of Ella (all of which appeared in the Samsung's files), the Court's assessment of the weight of evidence is entirely consistent with the jury's apparent conclusion that Kiger's testimony was credible.

That leaves Dawson's claims that he should get a new trial thanks to discrete errors of law.[8]  Rule 33 concerns more than the weight of the evidence; it also authorizes trial judges to retry cases "where substantial legal error has occurred." *Munoz*, 605 F.3d at 373.  *See also id.* ("any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial") (quoting *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004)).  As the link between Rule 33 and appellate review suggests, however, an error warrants a new trial only if it's prejudicial.  *See* FED. R. CRIM. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *accord Neder v. United States*, 527 U.S. 1, 7–8 (1999).

## B. Other Acts

Dawson first contends that the Court "committed prejudicial error" by allowing the Government to introduce evidence of other acts.  Motion at 1.  This of course looks past the Court's ruling that the Government could not introduce Dawson's state child-porn convictions or his "shock" probation.  (Although Dawson's post-trial briefing continues to mention "shock" probation, the trial testimony discussed only "probation," without elaboration, per the Court's pretrial ruling.)  Dawson complains about the admission of "his status on shock probation; possession of a cellular phone in violation of shock probation; other emails sent by Mr. Dawson; his internet search history; uncharged images and videos of Jane Doe in the bathroom; and uncharged videos of simulated sex with Jane Doe."  Motion at 4 (admission of this evidence was "prejudicial, improper[,] and caused confusion with the jury").

This is wrong.  As explained during pretrial conference and trial, the Federal Rules of Evidence contain a special propensity exception "[i]n a criminal case in which a defendant is accused of child molestation."  FED. R. EVID. 414(a).  That rule authorizes a trial judge to "admit evidence that the defendant committed any other child molestation" and let the jury "conside[r]" that evidence "on any matter to which it is relevant."  *See also United States v. Hruby*, 19 F.4th 963, 966 (6th Cir. 2021) ("Under the rule's plain terms …, evidence that a defendant previously molested a child may be admitted in a criminal case if he is accused of child molestation.").  And

---

[8] Dawson has not connected these evidentiary complaints to his request for acquittal, as opposed to a retrial.  Certainly none of the evidentiary issues suggest a rational jury could not convict Dawson.  He doesn't object, for example, to admission of the images themselves that underly Count 1–3.  Nor does he object to the introduction of the July 13 email exchanges.  He lodged a notice objection to the Suares emails sent on July 15, *see* Bench Conference, Trial Day 1, but that still left the Evli emails charged that same day.

of course, evidence of other acts is likewise admissible to the extent permitted by Rule 404(b)(2) (admissible to "prov[e] motive, opportunity, intent, preparation," etc.).

That is not to say, of course, that all "other-acts" evidence is admissible—or that the Court admitted everything the Government proposed. As previously discussed, the Court substantially limited the Government's presentation of Dawson's state conviction and supervised conditions (despite Rule 414's applicability). And, in response to Dawson's Rule 403 objections, the Court extensively questioned the Government—during the final pretrial conference and trial—about which search terms and history, bathroom images, and simulated-sex videos it planned to introduce. The Government's assurances to limit the jury's exposure, by quickly showing the most sensitive images and videos, mitigated any risk of needlessly cumulative or unfairly prejudicial evidence.

Dawson's only discernible argument against admission for most of the evidence is an implicit appeal to Rule 403: the "items were prejudicial, improper[,] and caused confusion with the jury." Motion at 4. Other-acts evidence offered under either Rule 404 or Rule 414 is, of course, "still subject to the Rule 403 balancing test." *United States v. Seymour*, 468 F.3d 378, 386 (6th Cir. 2006). But as already noted, Rules 413 and 414 provide an "exception to the default position set forth in Rule 404(b) that propensity evidence is presumptively more prejudicial than probative." *Id.* The Court need only ask whether the "probative value is substantially outweighed by the danger of … unfair prejudice." FED. R. EVID. 403. It is true that "Rule 413 evidence can be inherently prejudicial"; because it "describe[es] violent and sexual conduct, the evidence may have a strong propensity to evoke a visceral reaction from a lay jury." *United States v. LaVictor*, 848 F.3d 428, 450 (6th Cir. 2017). But "the codification of Rule 413, 414, and 415 represent[s] an understanding that sexual assault is different from regular prior bad acts." *Id.* (citing *United States v. Stout*, 509 F.3d 796, 801–02 (6th Cir. 2007)). And "[t]his difference is either that 'propensity evidence has special value in certain violent sexual misconduct cases or that the difficulty of and need for convictions for these crimes warrants a decrease in the usual protections against propensity and character evidence.'" *Id.*

So although Dawson is right that some of the evidence introduced against him surely *prejudiced* his defense, he identifies no *unfair* prejudice or other error in the Court's admissibility rulings. Nor has he unearthed any realistic prospect that, given the enormous weight of the evidence against Dawson and the careful measures the Court took to avoid undue prejudice, any single evidence ruling affected the outcome of his trial.

As to probationary status, the Court granted Dawson's motion in part by limiting the Government's presentation regarding his probation. The Court denied

17

the Government's request to introduce evidence that special conditions required Dawson to report his address to probation. It did not allow the Government to discuss why Dawson was on probation. The limited evidence the Government introduced through Officer Popham concerned when Dawson's probation term began and whether he disclosed possessing a phone. That information, of course, was inextricably intertwined with evidence regarding the seminal incident in this case: when Dawson tried to hide, in a dumpster, an undisclosed phone containing child porn from his probation officer. As the Court explained during the final pretrial conference and bench conferences during trial, this evidence "form[ed] an integral part of a witness's testimony" and "complete[d] the story of the charged offense." *United States v. Sumlin*, 956 F.3d 879, 890 (6th Cir. 2020) (quoting *United States v. Hardy (Marlando)*, 228 F.3d 745, 748 (6th Cir. 2000)). That information explained why Dawson visited the probation office on September 29 and how law enforcement legally searched his phone that same day. The jury knew nothing about why he was subject to cell-phone monitoring or whether he'd previously been convicted.[9]

As to the uncharged emails, Dawson objects to the introduction of these "other emails" in which he traded child pornography with others. His motion fails to identify, or even discuss, which uncharged emails he considers unduly prejudicial. So the Court assumes that he considers *any* emails impermissible. *See generally* Government Exhibits. 15A, 16, & 17A. But these exchanges in which Dawson traded child pornography surely offer evidence of his motive and intent to seek out images and videos of sexual exploitation of children, and thereby explain why he might've recorded pornography involving Ella to trade with other online voyeurs and pedophiles. *See, e.g., United States v. Stone*, No. 5:19-cr-10, 2020 WL 1877801, at *5 (W.D. Ky. Apr. 15, 2020) (internet searches for sexual abuse of teen girls was probative of "sexual interest in children"). The materials he exchanged closely resembled the ones he created, which "enhances [the] probative value" of the emails.

---

[9] Dawson also objects that jury heard "the start date of his probation, his restriction to the state of Kentucky and change of address without permission of his probation officer." Motion at 4. To his mind, this evidence was irrelevant and prejudicial. *See id.* But neither claim holds up. Of course the evidence was relevant: it helped explain (and prove) that Dawson was, in fact, on probation. And given that the jury *was* going to hear about Dawson's probation (and the testimony of his probation officer), the start date and ordinary conditions cannot have posed any additional threat. Moreover, Officer Popham doesn't appear to have testified directly about a condition that "restrict[ed Dawson] to the state of Kentucky and change of address without permission of his probation officer." Motion at 4. Popham answered a question from the prosecutor about whether Dawson mentioned any address changes or interstate travel, but never testified that release conditions *required* such updates. *See* Trial Testimony, Day 1 (Popham).

*Seymour*, 468 F.3d at 385. And as to Rule 403 prejudice, it's hard to see how the uncharged email exchanges were unfairly prejudicial—or indeed any more prejudicial than the *charged* emails, images, and videos. *See United States v. Harvel*, 115 F.4th 714, 737 (6th Cir. 2024) ("The uncharged allegations … did not change 'the tone and tenor of the trial.'") (quoting *United States v. Mandoka*, 869 F.3d 448, 456 (6th Cir. 2017)).

As to his internet search history, the Government introduced evidence of Dawson's search history, pulled from Cellebrite reports, in July and August 2022 (during and just before the remainder of the charged conduct). *See* Government Exhibits 33A & B. That showed a search for "blindfold deepthroat" sixty-two times in August 2022. As with the uncharged emails, the Court considered this evidence admissible to prove Dawson's motive and intent. These searches occurred around the same time Dawson blindfolded Ella and stuck his penis in her mouth, as charged in Count 1. *See Seymour*, 468 F.3d at 385 (recognizing the "enhance[d] … probative value," in sex-crime cases, of evidence of "markedly similar" past conduct).

As to the bathroom images, the Government admitted 200 images, shown rapidly in a 2-minute presentation, of Ella standing in the bathroom dressed provocatively in fishnet stockings and heels. Defense counsel argued, in pretrial filings and a bench conference during the first day of trial, that the sheer number created a risk of undue prejudice. The Court overruled that objection during a bench conference, but took precautions to address Dawson's concern, principally by limiting the length of the presentation. *See id.* Dawson has offered no persuasive reason or caselaw suggesting that ruling was erroneous. The images, found on the Samsung, tended to show Dawson's sexual interest in Ella, and the conduct occurred at the same location, and at the same time, as the charged conduct. *Cf. Harvel*, 115 F.4th at 736 ("Our cases recognize that the value of uncharged sexual assaults can often turn on how closely those assaults resemble the charged offenses."). These images showed, at a minimum, the grooming of a minor victim later subjected to far more heinous acts.

Finally, as to "uncharged videos of simulated sex," Motion at 4, the Court rejected this argument for the same reasons. The images were especially probative because they showed Dawson manipulating the camera and attempting to capture his conduct with Ella—supporting the Government's argument that Dawson used devices at his ready to record his sexually charged interactions with the child. These videos, which were found on the Samsung phone, tended to show that Dawson had the intent to produce sexual images of a child, an opportunity to exploit Ella, and a plan to groom her for such sexually explicit acts. And this conduct was no more prejudicial than the visuals of his humping and groping Ella. Moreover, the

19

Government's presentation of the evidence focused on the charged conduct, not ancillary images of Dawson's sexually suggestive behavior with Ella.

### C. Disclosure

Even admissible evidence, Dawson next contends, should've been excluded due to discovery violations. This argument takes two forms. First, the Court should've excluded photos, videos, and editing applications that the Government disclosed too late. Second, the Government's supplemental expert disclosure arrived too late—just two weeks before trial—and was too spare in any event, listing only a subset of the opinions Agent Kiger issued from the stand. Truly curing these deficiencies, Dawson insists, would've required the Court to forbid the "introduction of evidence that was not properly or timely disclosed by the United States" and "limit the testimony of the [United States'] expert." Motion at 1–2.

**1.  *Evidence.***  Dawson's first contention concerns what he considers late-disclosed evidence. With respect to some evidence, the Court did just as Dawson asked—excluding videos the Government intended to introduce under Count 1 because the Government's initial disclosure represented that its Count 1 evidence consisted only of still images.[10]

The other evidence Dawson objects to, however, satisfied disclosure obligations. Federal Rule of Criminal Procedure 16 requires that the Government permit the Defendant to inspect and copy documents it intends to use during its case-in-chief during trial. *See* FED. R. CRIM. P. 16(a)(1)(E). And it must also disclose any testimony it "intends to use at trial under Federal Rules of Evidence 702, 703, or 705 during its case-in-chief." FED. R. CRIM. P. 16(a)(1)(G)(i).

The Government *did* disclose the evidence it presented of the animation and collage applications on Dawson's phone. The Cellebrite report, which the Government made available to defense counsel several months before trial, mentioned the applications. And the Government had disclosed collages of Ella, other pornography images, and Jellify videos. So the expert could testify to the existence of the editing applications without running afoul of disclosure obligations. Dawson hasn't pointed to anything undermining this description of the record.

---

[10] The Government's expert explained in his report that the images were screenshots, not animated GIF files. An amended expert report later revealed the animation and explained why his report omitted that detail. *See* DN 77-2. But the Court rejected the Government's attempts to introduce this evidence. *See* Bench Conference, Trial Day 1. Instead, the Court limited the Government to the presentation of the still shots (which the defense had), in quick succession, consistent with the representations it made to defense counsel for months.

20

Moreover, the Court took pains to limit Agent Kiger's expert testimony in response to Dawson's objections. Because the parties disagreed about the potential scope of the testimony, the Court permitted defense counsel to *voir dire* the witness, out of the jury's earshot, before the jury heard from him. During that *voir dire*, Kiger explained that he could not definitively determine which device took the images underlying the charged conduct.

Consistent with the limitations of Kiger's report and his candid answers during *voir dire*, the Court allowed him to testify that the applications were installed on Dawson's phone—but *not* to testify that Dawson used the applications to create any specific images. Lawyers on both sides repeatedly asked whether Kiger could confirm that Dawson did so, and repeatedly Kiger answered that he could not. That more likely helped than hindered Dawson's defense.

Still, Dawson contends, the Court erred in allowing the Government to introduce—and Kiger to testify about—a "screenshot from the Jellify image for Count 3." Motion at 4. The image itself might've been unproblematic, Dawson urged, but the Government disclosed just three days before trial that investigators found the photo saved in Dawson's phone as a "screenshot." *See* Bench Conference, Trial Day 1. That fact, he argues, "presented stronger evidence of a connection of the image to the subject phone." Motion at 4. Be that as it may, the Government explained that it had disclosed the still-frame, screen-shotted image to defense counsel long before pointing out the image's location within Dawson's file system. (Dawson hasn't contradicted this.) Then, before allowing Kiger to testify about the screenshot image, the Court asked him (away from the jury) to describe the naming convention of that file and what he could infer from it. Even with a screenshot extension, Kiger explained, he could not definitively opine that the Samsung captured the image. *See* Trial Testimony, Day 2 (Kiger). And last, when Agent Kiger did testify about the image, he stayed within the groove carved during *voir dire*: he never opined that Dawson used his Samsung to create the screenshotted image.

**2. *Opinions.*** Dawson next reiterates his objection (thoroughly debated during pretrial and midtrial discussions) that the Government failed to provide proper notice of Agent Kiger's expert opinions. Motion at 5. He contends that in many, many respects, the Government "fail[ed] to properly provide notice of the extent of the expert's opinions." *Id.* And the *voir dire* the Court allowed, Dawson maintains, failed to "cure the [notice] issue" regarding the Kiger report. *Id.* at 6. This argument fails for at least four reasons.

First, even assuming that Kiger's testimony surpassed the limits of his report in some respects, Dawson is wrong to suggest that exclusion would be the sole and automatic remedy. Rule 16 doesn't require any sanction at all, but instead authorizes

21

the trial judge to decide on the need for and extent of any evidentiary limitations. *See* subdivision (d)(2) ("the court *may*" take corrective steps "[i]f a party fails to comply with this rule") (emphasis added). And it gives judges discretion to fashion sanctions appropriate to the nature of any violation: to "prescribe … just terms and conditions" for an adversary's "inspection" of evidence, to "grant a continuance," to "prohibit [the offending] party from introducing the undisclosed evidence," or to "enter any other order that is just under the circumstances." *Id. See also United States v. Bauer*, 82 F.4th 522, 535 (6th Cir. 2023) ("If a party fails to comply with this rule, the district court has discretion to exclude the evidence or order other remedies."). The Court addressed any risk and prejudice caused by the Kiger report by allowing for *voir dire* of the witness. This avoided any surprising or inadmissible testimony not disclosed in the report. And Dawson hasn't offered any persuasive reason why *voir dire* fell short of curing any notice deficiency.

Second, Dawson seemingly implies that Rule 16 bars experts from elaborating and supplementing their reports. But he's offered no caselaw to support such a restricted, and inflexible, view of expert testimony. The Government must file a disclosure listing "a complete statement of all opinions that the government will elicit from the witness in its case-in-chief," as well as "the bases and reasons for" the witness's opinions. FED. R. CRIM. P. 16(a)(1)(G)(iii). But the "complete statement" requirement "does not require a verbatim recitation of the testimony the expert will give at trial." FED. R. CRIM. P. 16, Advisory Committee Notes, 2022 Amendments. Like its civil counterpart, the rule doesn't "limit an expert's testimony simply to reading his report." *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006). Instead, "[t]he rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Id.*

That is just what Agent Kiger did. Although his report never said with certainty that the Jellify application on Dawson's phone was "used to enhance the images" behind Counts 1–3, neither did his trial testimony.

His report and testimony tracked the same cautious line regarding any use of the collage the GIF Maker applications found on the phone. Neither definitively stated that Dawson's phone "took or recorded any of the images" or was used to enhance any of the images. Motion at 5–6. Kiger's report instead noted what evidence could—and couldn't—be confidently traced to the phone. *See* Report (DN 77-1) at 5, 7–8; Amended Report (DN 77-2) at 2 (two collage apps were installed on the phone, but not necessarily used); Report at 8 ("twelve variations of [a] screen shot … were edited in one way or another"); *id.* at 9 (time stamps indicated when photos were taken); *id.* at 6–7 (photo was "probabl[y]" created by the phone); *id.* at 7–8 (tracing photos to a Russian email address).

22

At trial, Kiger didn't say with "a hundred percent" certainty which recording device captured the videos, *see* Trial Testimony, Day 2 (Kiger), nor could he opine about "where" the screenshots depicting the count-one charged conduct originated, *see* Trial Testimony, Day 3 (Kiger).  Although he mentioned that it was "possible" that the Samsung device filmed or "made" the images in which Ella appeared, that's consistent with his report—and he never definitively opined that the Samsung "produced" the images.  Certainly that careful approach doesn't reflect trial by ambush.  And for this reason, it's hard to see how any disclosure error prejudiced Dawson—who has not explained what parts of this testimony the Court should've excluded, or what Kiger might've said instead.  Third, much of Kiger's testimony about the provenance of specific images was induced by Dawson's incisive cross-examination.  Defense counsel questioned Kiger about his uncertainty—and his answers reflected his inability to definitively opine about whether Dawson used the Samsung to produce any of the images.  *See generally* Kiger Cross-Examination, Trial Day 3.    These opinions on cross examination aren't subject to Rule 16's disclosure rule at all.  *See* FED. R. CRIM. P. 16(a)(1)(G)(iii) (requiring disclosure of "opinions that the *government* will elicit") (emphasis added); *Thompson*, 470 F.3d at 1203 (noting the tension between an interpretation that would "limit an expert's testimony simply to reading his report" and the reality that experts are "subject … to cross-examination upon [their] report[s]").

Fourth, and finally, the choice of remedies was hardly dispositive here.  Viewed in the light of the whole record, Kiger's testimony about applications used to modify photos, and about which cameras took photos, did not plausibly "affec[t] the outcome of the district court proceedings."  *United States v. Olano*, 507 U.S. 725, 734 (1993).  As explained in more detail below, the Government's sexual-exploitation charge didn't require it to prove that Dawson *took* or *edited* the photos and videos—just that he used Ella to "produce" a sexually explicit depiction.  *See, e.g.*, *United States v. Ogden*, 685 F.3d 600, 605 (6th Cir. 2012) ("All the government needed to prove for the [§ 2251(a)] charge was that [the defendant] induced the victim to engage in conduct to produce at least one explicit image.").  The evidence made clear that Dawson did that, whether or not he held the camera or edited the images.  To the extent Rule 33 requires the Court to sit as "a thirteenth juror, weighing evidence and making credibility determinations," the Court has no doubt that "justice" was served in this case.  *United States v. Matthews*, 31 F.4th 436, 448–49 (6th Cir. 2022) (quotation marks omitted).[11]

---

[11] To the extent Dawson worries about the sufficiency of the evidence under Rule 29, the jury had plenty of evidence to conclude that Dawson produced the images—with or without Kiger's opinions.

### D. The Jury Instructions

In Dawson's view, the Court committed one final error in its jury instructions. As to Counts 1–3 (sexual exploitation of a minor under 18 U.S.C. § 2251), the Court instructed the jury that someone can "produc[e] a visual depiction" "not only" by "making" or "creating" photos but by "copying" them. Jury Instructions (DN 89) at 5–6. Including "copying" within the definition of production, Dawson says, amounts to a "substantial legal error [that] requir[es] a new trial." Motion at 7.

The Sixth Circuit, however, has squarely held that "'producing' child pornography, within the meaning of § 2251(a), encompasses copying images onto a hard drive." *United States v. Lively*, 852 F.3d 549, 559 (6th Cir. 2017). Section 2256(3), the panel explained, defines "producing" to include "producing, directing, directing, manufacturing, issuing, publishing, or advertising." *Id.* at 560. That string of verbs, the panel explained, is "sufficiently broad, and sufficiently non-technical, to encompass copying images onto a hard drive." *Id.* True, as Dawson points out, *Lively* nevertheless "approved the [district court's] use of the pattern instructions" instead of requiring district courts to instruct juries about copying. Defendant's Motion at 101. But that hardly means—and the Defendant makes no effort to explain why—an alternative formulation amounted to legal error. *Cf. Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (holding that no "particular form of words [need] be used in advising the jury," and that instructions must instead "correctly convey the concept") (quotation marks omitted)).

Nor could he. In fact, Dawson agreed in his pretrial filings and during trial that producing indeed includes copying. Motion to Limit Expert Testimony (DN 79) at 4 n.1 ("Whether production encompasses copying images is covered in the pattern instructions' definition of the term 'producing.'"); *see generally* Bench Conference, Trial Day 3. Chapter 16 of the Sixth Circuit's pattern instructions now repeatedly notes *Lively*'s holding that "copying" is a form of "producing." In the context of the long list of verbs provided to the jury—"making, creating, directing, manufacturing, issuing, publishing, advertising, or copying," Phase I Jury Instructions at 6—that verb merely advised the jury of one among many ways to violate § 2251(a). *Cf. Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973) (reciting "the well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge," as well as the "testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and [other] instruction of the jury by the judge"). Given this context, it was not error to instruct the jury on a relevant holding of the Sixth Circuit.

**ORDER**

With no reason to disturb the jury's verdict, the Court denies the Defendant's motions for acquittal and a new trial.